Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000499
22-DEC-2017
08:26 AM

NO. CAAP-15-0000499

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
JAMES KIMO MOSES, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 11-1-0320)

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, and Fujise and Chan, JJ.)

This case arises out of a fire started with an ignitable liquid at a two-story boarding house on Liliha Street. One of the residents, Clarence Isobe (Isobe), died as the result of the fire. Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant James Kimo Moses (Moses) with numerous counts, including: (1) attempted first-degree murder for attempting to cause the death of more than one person in the same or separate incident (Count 1); second-degree murder of Isobe (Count 2); attempted second-degree murder of boarding house residents Maurice Delima (Count 3), Opena Dominador (Count 4), Robert Horita (Count 5), Pedro Elika (Count 6), and Marion Manaois (Count 7); and first-degree arson (Count 8).[1]

---

[1] Moses was also charged with third-degree promoting a dangerous drug (Counts 9, 10, and 11) and fourth-degree promoting a harmful drug (Count 12). Moses pleaded no contest to these drug charges (Counts 9 through 12) before trial, and they are not at issue in this appeal.

After a trial, the jury found Moses guilty of the lesser included offense of manslaughter of Isobe on Count 2; guilty as charged of attempted second degree murder of Maurice Delima (Delima) on Count 3 and Opena Dominador (Dominador) on Count 4; guilty of the lesser included offense of attempted third-degree assault of Robert Horita (Horita) on Count 5 and Marion Manaois (Manaois) on Count 7; guilty of the lesser included offense of attempted second-degree assault of Pedro Elika (Elika) on Count 6; and guilty as charged of first-degree arson on Count 8. The jury did not return a verdict on the attempted first-degree murder charged in Count 1, and the Circuit Court of the First Circuit (Circuit Court) entered a judgment of acquittal on that count.

The Circuit Court sentenced Moses to concurrent terms of life imprisonment with the possibility of parole for Counts 3 and 4, twenty years of imprisonment for Counts 2 and 8, five years of imprisonment for Count 6, and one year of imprisonment for Counts 5 and 7. The Circuit Court entered its "Judgment of Conviction and Sentence" (Judgment) on June 3, 2015.[2]

On appeal, Moses contends that: (1) there was insufficient evidence to support his convictions on Counts 3, 4, 5, 6, and 7; and (2) the Circuit Court erred in denying his request for post-trial relief, which was based on his claim of inconsistent verdicts.[3] We affirm.

BACKGROUND

I.

After midnight on February 2, 2011, the police responded to a large fire at a two-story boarding house on Liliha Street in Honolulu. When the police arrived at about 12:38 a.m., there was a lot of smoke coming from the building, and the police had to park a distance away due to the size of the fire. The

---

[2] Honorable Dexter D. Del Rosario presided.

[3] We note that on appeal, Moses does not challenge his manslaughter conviction on Count 2 or his first-degree arson conviction on Count 8.

2

fire department engines arrived at the scene minutes later, but by that time, the bulk of the second floor and the roof of the building were engulfed in flames. The scene was chaotic; people were running from the building to escape, and others were trying to get into the building to ensure that no one had been left behind.

During the commotion, residents of the boarding house realized that Isobe, one of the second-floor residents, was still inside. They reported this to the firemen. The firemen found Isobe inside the boarding house on the second floor, brought him outside, and began giving him CPR. Isobe was taken to Queen's Medical Center, where he was declared dead that morning at 10:13. An autopsy revealed that Isobe had second and third degree burns over 50 percent of his body. The forensic pathologist who performed the autopsy testified that the cause of death was the "combined effects of thermal burns and carbon monoxide toxicity due to a house fire."

II.

The second floor of the boarding house where Isobe resided consisted of a kitchen, two bathrooms, and nine different resident's rooms. The second floor had two stairway exits, one on the makai side of the building that required going through the kitchen to access (Makai Stairwell), and other one on the Ewa side of the building that was at the end of the hallway between the residents' rooms (Ewa Stairwell).

Fire Investigator Warren Iseke (Iseke) concluded that the fire was intentionally set with an ignitable liquid on the Makai Stairwell. Iseke believed that at about 12:30 a.m. on February 2, 2011, someone had poured or splashed an ignitable liquid on the step just below the second-floor landing of the Makai Stairwell then ignited the liquid with an open-flame source (such as a lighter); that flames from the fire entered the second floor through the kitchen windows and one of the resident's rooms next to the kitchen; and that from there the fire spread to the rest of the second floor. Iseke believed that it probably took

3

about 30 seconds to a minute for the flames to reach the eves of the building. Once the fire entered a room, it would take about three to four minutes for the room to come to full ignition, where everything would be burning. On the step below the second-floor landing of the Makai Stairwell, investigators recovered plastic debris that appeared to be the remains of a red plastic gas container. The plastic debris and the wooden step on which the debris was found were tested and found to contain gasoline.

Photographs introduced at trial indicated that the second-floor kitchen and Makai Stairwell sustained extensive fire damage. Most of the second-floor rooms also had heat and flame damage. The fire was not extinguished until 3:30 a.m, which was about three hours after Iseki believed the fire had been started. The fire resulted in over $20,000 worth of damage to the boarding house.

III.

Moses had been a long-time resident of the boarding house and had a room on the second floor. However, about a month before the fire, Moses had vacated his room after the owner of the boarding house had filed an eviction action against him and a court had ordered him to leave.

Prior to being evicted, Moses had lived at the boarding house with his father since the mid 1980s, and he continued to live there after his father passed away. From 2006, Moses lived with his girlfriend, Marissa Paulino (Paulino), in a room on the second floor. However, on August 31, 2010, the owner of the boarding house notified Moses that he had 45 days to vacate the premises. Moses did not leave, and on November 3, 2010, the owner filed an eviction action in district court against Moses. The district court ordered that Moses be evicted, and it issued a judgment for possession and a writ of possession in favor of the owner, which required Moses to vacate the premises by December 1, 2010. Moses, however, did not actually vacate the premises until sometime between December 25, 2010, and January 1, 2011, which was about a month before the fire.

4

Moses was upset about being evicted from his long-time residence. He told Cecilia Awana (Awana), a friend of Moses for 20 years, that he felt that some of the residents of the boarding house, specifically Delima and Rose Talaban, were "backstabbers." Another friend, Glenn Cannalte (Cannalte), said Moses was "pissed" when he received his eviction letter. Cannalte later helped Moses move out sometime in late December or January and Moses grumbled about the "inconvenience of . . . moving."

After being evicted, Moses moved with Paulino to the house of Tony Taum (Taum). However, sometime in January of 2011, Moses and Paulino got into a physical fight. Paulino told Moses that their relationship was over, and she did not speak with him for about two weeks. Taum told Moses to leave, but allowed Paulino to stay. Moses moved in with his friend, Kyp Jones (Jones).

About a week before the fire, Moses asked Cannalte to fill up two red plastic gasoline containers with $20 of gasoline. Cannalte did so and dropped off the containers at Jones' house. After the fire, Cannalte went back to Jones' house and did not see the gas containers where he had left them.

Prior to their breakup shortly before the fire, Moses and Paulino had been together for five years. About two or three days after the fire, Paulino agreed to meet with Moses. Paulino met Moses and rode with him on his moped to a school. Moses was driving faster than normal and appeared to be upset. After reaching the school, Moses got off the moped and told Paulino, "I burn the house." Moses said this with his back to Paulino. When Paulino said "What?", Moses did not elaborate.

Awana testified that she was near the boarding house on the night of the fire. She saw a lot of smoke and a crowd of people gathered outside the boarding house. Awana thought she saw Moses on his moped with the engine off "rolling away" from the fire. This person's back was to Awana, and she was asked how she could recognize him. Awana replied, "Because I recognize [Moses]. . . I know [Moses]."

5

IV.

Manaois, one of the second-floor residents, heard someone from downstairs scream "fire, fire." Manaois smelled burning wood, and she followed that smell to the kitchen, where she saw an "angry fire" on the Makai Stairwell and a lot of smoke in the kitchen. Manaois began knocking on all of the residents' doors on the second floor to wake and warn them. Delima, the resident manager, attempted to fight the fire with a fire extinguisher and a water hose, but was unsuccessful. Delima and other residents evacuated the boarding house and gathered across the street. The residents then realized that Isobe was missing and notified firemen who were at the scene.

DISCUSSION

I.

Moses contends that there was insufficient evidence to support his convictions on Counts 3, 4, 5, 6, and 7. Specifically, Moses argues that the State presented insufficient evidence that he intended to kill Delima (Count 3) and Dominador (Count 4); that he intended to cause substantial bodily injury to Elika (Count 6); and that he intended to cause bodily injury to Horita (Count 5) and Manaois (Count 7). We conclude that Moses' argument is without merit.

A.

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the State. State v. Ildefonso, 72 Haw. 573, 576, 827 P.2d 648, 651 (1992). "The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact." State v. Hoe, 122 Hawai'i 347, 349, 226 P.3d 517, 519 (App. 2010) (block quote format altered; citation omitted). "Matters of credibility and the weight of the evidence and the inferences to be drawn are for the fact finder." State v. Romano, 114 Hawai'i 1, 8, 155 P.3d 1102, 1109 (2007). "[A]ppellate courts will give due deference to the right of the trier of fact to determine credibility, weigh the evidence, and

6

draw reasonable inferences from the evidence adduced." State v. Agard, 113 Hawai'i 321, 324, 151 P.3d 802, 805 (2007) (internal quotation marks and citations omitted).

With respect to establishing criminal intent, "'[i]t is an elementary principle of law that intent may be proved by circumstantial evidence; that the element of intent can rarely be shown by direct evidence; and it may be shown by a reasonable inference arising from the circumstances surrounding the act.'" State v. Hopkins, 60 Haw. 540, 544, 592 P.2d 810, 812-13 (1979) (citation omitted). A defendant's criminal intent "'may be read from his acts, conduct and inferences fairly drawn from all the circumstances.'" State v. Stocker, 90 Hawai'i 85, 92, 976 P.2d 399, 406 (1999) (block quote format altered; citations omitted).

B.

In Counts 3 through 7, Moses was charged with attempted second-degree murder, attempted second-degree assault, and attempted third-degree assault. Hawaii Revised Statutes (HRS) § 705-500 (2014), entitled "Criminal attempt," provides in relevant part:

> (1) A person is guilty of an attempt to commit a crime if the person:
>
> . . .
>
> (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
>
> (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
>
> (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

(Emphasis added).

7

On appeal, Moses does not challenge the sufficiency of the evidence that he committed arson by intentionally or knowingly setting fire to the boarding house. He also does not challenge any aspect of the sufficiency of the evidence on Counts 3 through 7, except for the sufficiency of the evidence that he intended to cause the injury (death, substantial bodily injury, or bodily injury) applicable to the attempted offenses of which he was found guilty.

We conclude that there was substantial evidence to prove that Moses acted with the requisite criminal intent. The victims in the challenged counts were all residents of the second floor of the boarding house, had lived there with Moses, and were living there when Moses vacated the boarding house a month before the fire. Moses deliberately set the fire, using gasoline as an accelerant, late at night, when it was dark, and the residents would be home and likely sleeping. He set the fire at the Makai Stairwell, one of only two exits from the second floor, rendering that exit inaccessible.

Viewing Moses' "acts, conduct and inferences fairly drawn from all the circumstances" in the light most favorable to the State, we conclude that there was sufficient evidence to show that Moses intentionally engaged in conduct which was a substantial step in a course of conduct intended or known to cause death, substantial bodily injury, or bodily injury. The commentary to the criminal attempt statute is instructive as it provides an example directly applicable to Moses' conduct in this case:

> In subsection (2) liability is imposed on a defendant who has intentionally engaged in conduct which is a substantial step in a course of conduct intended or known to culminate in a prohibited result. Thus, a defendant who intends to destroy a building, and who regards the destruction of its inhabitants as a regrettable by-product, could be convicted of attempted murder (as well as attempted arson) if the defendant intentionally performed a substantial step (e.g., started a fire) which the defendant knew (i.e., was practically certain) would result in death.

HRS § 705-500 cmt. (footnote omitted; emphasis added).

C.

The jury's verdicts on the attempted offenses corresponded with the degree of danger and risk of injury faced by the residents based on where their rooms were located in relation to where the fire was started. The fire was started near the top of the Makai Stairwell and entered the second-floor through the kitchen. Thus, the only available exit was the Ewa Stairwell.

The victims for the attempted second-degree murder convictions, which the jury was instructed required proof that Moses intentionally engaged in conduct which is a substantial step in a course of conduct intended or known to case death, were Delima (Count 3) and Dominador (Count 4). Their rooms were the farthest away from the Ewa Stairwell, the only accessible stairwell, and unlike the other rooms, were positioned such that they could have been trapped in their rooms if the fire quickly spread from its starting point, through the kitchen, and into the hallway. If this occurred, Delima and Dominador, unlike the other residents, would have had to cross through the fire from their rooms to get to the Ewa Stairwell. The victims for the attempted third-degree assault convictions, Horita (Count 5) and Manaois (Count 7), had rooms that were the closest to the Ewa Stairwell. The victim for the attempted second-degree assault conviction, Elika (Count 6), had a room that was closer to the Ewa Stairwell than Delima's and Dominador's rooms but farther away than Horita's and Manaois' rooms, and Elika's room was closer to where Moses set the fire than Horita's and Manaois' rooms. From their rooms, Elika, Horita, and Manaois did not have to pass by the kitchen to get to the Ewa Stairwell.

Based on the evidence presented, the jury could reasonably have concluded that by deliberately using gasoline to set a fire late at night at the Makai Stairwell, Moses intended to cause the death of Delima and Dominador, substantial injury to Elika, and bodily injury to Horita and Manaois.

9

Moses' claim that "he could not have known which residents lived in any particular room at the time of the fire" is without merit. The trial evidence indicated that the victims for Counts 3 through 7 lived in the same rooms at the time of the fire that they occupied when Moses was forced to leave the boarding house a month before the fire. More importantly, Moses fails to demonstrate why proof of his knowledge of the rooms that the victims occupied at the time of the fire was necessary to establish his guilt on the attempted offenses found by the jury. Moses' claim that there was no evidence that he harbored animosity toward the victims, except Delima, is also unavailing. The attempted offenses do not require proof that the defendant harbored animosity toward the victim.

## II.

The jury found Moses guilty in Count 2 of the lesser included offense of manslaughter for recklessly causing the death of Isobe. Citing HRS § 701-109(1)(c) (2014),[4] Moses contends that he is entitled to relief because the verdicts on Count 2 and Counts 3 through 7 were inconsistent or mutually exclusive. He requests that his convictions on Counts 3 through 7 be vacated or reduced to offenses with a reckless state of mind. Moses' argument is without merit.

## A.

At the outset, we note that "[a]s a general proposition, 'inconsistent verdicts are not per se grounds for reversal.'" Briones v. State, 74 Haw. 442, 474, 848 P.2d 966, 981 (1993) (Levinson, J., concurring) (brackets omitted) (quoting

---

[4] HRS § 701-109(1)(c) provides:

(1)    When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

.  .  .

(c)    Inconsistent findings of fact are required to establish the commission of the offenses[.]

10

State v. Liuafi, 1 Haw. App. 625, 643, 623 P.2d 1271, 1282 (1981)).

In United States v. Powell, 469 U.S. 57, 58 (1984), the United States Supreme Court explained its long-established rule that "a criminal defendant convicted by a jury on one count could not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count." The Supreme Court stated:

> [W]here truly inconsistent verdicts have been reached, the most that can be said is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors. First, . . . inconsistent verdicts . . . should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on [one] offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [other] offense. But in such situations the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.
>
> Inconsistent verdicts therefore present a situation where "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course. . . . [N]othing in the Constitution would require such a protection, and we therefore address the problem only under our supervisory powers over the federal criminal process.

Id. at 64-65 (internal quotation marks, citations, brackets, and ellipsis points omitted).

In addressing the question of inconsistent verdicts under its supervisory powers, the Supreme Court explained its reasons for concluding that inconsistent verdicts do not provide a criminal defendant a basis for relief:

> For us, the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest. This possibility is a premise of [the] alternative rationale [of Dunn v. United States, 284 U.S. 390 (1932)] -- that such inconsistencies often are a product of jury lenity. Thus, Dunn has been explained by both

11

> courts and commentators as a recognition of the jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the Executive Branch.
>
> The burden of the exercise of lenity falls only on the Government, and it has been suggested that such an alternative should be available for the difficult cases where the jury wishes to avoid an all-or-nothing verdict. Such an act is, as the Dunn Court recognized, an assumption of a power which the jury has no right to exercise, but the illegality alone does not mean that such a collective judgment should be subject to review. The fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable.

Id. at 65-66 (internal quotation marks, citations, and brackets omitted). The Court further reasoned that inconsistent verdicts should not provide a basis for review because: (1) "individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake"; and (2) "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts" -- courts must be satisfied that based on the evidence presented, a jury could rationally have found the defendant guilty. Id. at 66-67.

In the context of civil cases, the Hawai'i Supreme Court has stated that verdicts must be "irreconcilably inconsistent" to warrant a new trial. Shanghai Inv. Co. v. Alteka Co., 92 Hawai'i 482, 496, 993 P.2d 516, 530 (2000). In Shanghai, the supreme court stated:

> a conflict in the jury's answers to questions in a special verdict will warrant a new trial only if those answers are irreconcilably inconsistent, and the verdict will not be disturbed if the answers can be reconciled under any theory. When faced with a claim that the verdicts are inconsistent, the court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort before it is free to dismiss the jury's verdict and remand the case for a new trial.

Id. at 496-97, 993 P.2d 530-31 (block quote format altered; citation, brackets, and ellipsis points omitted).

12

B.

We need not address whether Moses is entitled to the relief he requests based on his claim of inconsistent verdicts because, contrary to Moses' contention, we conclude that the jury's verdicts on Count 2 and Counts 3 through 7 were not inconsistent, much less irreconcilably inconsistent, or mutually exclusive. As the State argues, in rendering its verdicts, the jury apparently "focused on the ability of the occupants of the various rooms to escape from the fire." The jury's verdicts can rationally be explained by the degree of peril each victim faced based on the location of the victim's room in relation to where Moses set the fire. Moses set the fire on the Makai Stairwell next to the kitchen, making the Makai Stairwell inaccessible, and the fire went from the Makai Stairwell through the kitchen and into the hallway. Delima and Dominador, the victims of the attempted second-degree murder convictions, occupied rooms farthest away from the only accessible stairwell (the Ewa Stairwell) and would have to cross through the fire, if it spread through the kitchen, to escape from their rooms. Horita and Manaois, the victims of the attempted third-degree assault convictions, occupied rooms that were the closest to the Ewa Stairwell and would not have to pass by the kitchen to escape from their rooms. Elika, the victim of the second-degree assault conviction, occupied a room that was between the rooms occupied by Delima and Dominador and the rooms occupied by Horita and Manaois. Elika's room was closer to where Moses set the fire than Horita's and Manaois' rooms, but Elika would not have to pass by the kitchen to escape from his room.

As previously noted, there was substantial evidence to prove that Moses acted with the requisite criminal intent to establish each of the attempted offenses on which the jury returned guilty verdicts in Counts 3 through 7. These verdicts were not inconsistent and can easily be read as expressing a coherent view of the case.

Isobe, the victim of the manslaughter conviction in Count 2, occupied a room that was located in a position similar

13

to Elika's room. Isobe's room was between the rooms occupied by Delima and Dominador and the rooms occupied by Horita and Manaois, Isobe's room was closer to where Moses started the fire than Horita's and Manaois' rooms, and Isobe would not have to pass by the kitchen to escape from his room. However, unlike the victims of the attempted offenses, Isobe was not able to escape and he died in the fire. It was rational and not inconsistent for the jury to find that while Moses intended to cause substantial bodily injury to Elika, he acted with a reckless state of mind in actually causing Isobe's death. In other words, it was not inconsistent, or mutually exclusive, for the jury to find that Moses intended to cause substantial bodily injury to Isobe (just like Elika), but did not intend to cause and was only reckless in causing Isobe's death, and then proceed to find Moses guilty of manslaughter, an offense more serious than attempted second-degree assault.

Based on our analysis, we reject Moses' contention that the verdicts on Count 2 and Counts 3 through 7 were inconsistent or mutually exclusive. For the same reasons, we conclude that inconsistent findings of fact were not required to establish the offenses found by the jury in these counts. See HRS § 701-109(1)(c).

CONCLUSION

For the foregoing reasons, we affirm the Circuit Court's Judgment.

DATED: Honolulu, Hawai'i, December 22, 2017.

On the briefs:

Phyllis J. Hironaka
Deputy Public Defender
for Defendant-Appellant

Brian R. Vincent
Deputy Prosecuting Attorney
City and County of Honolulu

*Craig H. Nakamura*

Chief Judge

Associate Judge

Associate Judge

14